THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR17-0097-JCC |
| Plaintiff, | ORDER |
| v. | |
| ARJAY CARAANG, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion to suppress (Dkt. No. 32) and the Government's motion to seal (Dkt. No. 41). Having thoroughly considered the parties' briefing and the relevant record, the Court finds that neither an evidentiary hearing nor oral argument is necessary[1] and hereby DENIES Defendant's motion to suppress (Dkt. No. 32) and GRANTS in part and DENIES in part the Government's motion to seal (Dkt. No. 41) for the reasons explained herein.

**I.  BACKGROUND**

On September 24, 2016, at approximately 1:46 a.m., an employee at the Cloud Nine Tavern ("Cloud Nine") called 911 to report an incident involving a customer with a gun. (Dkt.

---

[1] An evidentiary hearing is required "only when . . . contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000). Here, the parties rely on the same documentary evidence to support their positions, and neither side has demonstrated with specificity that contested issues of fact exist.

No. 30-1 at 2.) Over the next five minutes, the employee provided the following information to the dispatcher who relayed it to police officers responding to the scene:[2]

> 01:46 – A customer was in the Cloud Nine parking lot waving a gun around.
>
> 01:47 – The subject was standing next to a silver Toyota Camry with license plate number ABV-6818.
>
> 01:48 – The subject was described as a male, Pacific Islander in his early 20s, about 5'6", with long black hair, wearing a Seahawks hat and clothing. He had possibly been drinking, and was last seen holding a silver pistol in his right hand.
>
> 01:49 – The subject was with 5 to 10 others in the parking lot, listening to loud music and possibly arguing. The reporting party heard the pistol make a "click" sound, which he believed was a round being chambered.
>
> 01:50 – The Toyota associated with the subject began reversing in the parking lot, and was last seen possibly pulling out northbound from Cloud Nine.

(*Id*. at 2–3.)

The reporting party gave his name and phone number before hanging up. (*Id*. at 3.) Kent police Officers Rausch and Hale drove to Cloud Nine to identify potential victims and witnesses, while Officers Prusa and Steiner pursued the Toyota. (*Id*.) As Officer Prusa arrived at Cloud Nine, she saw a silver Toyota Camry with license plate ABV-6818 leaving the parking lot. (Dkt. No. 43-3 at 5.) The CAD log contains the following entries about what happened next:

> 01:52 – Officer Prusa pulled the Toyota over a few blocks from Cloud Nine.
>
> 01:55 – Officer Rausch reported that there was "No PC, No Victim."
>
> 01:56 – Officer Hale reported that a bouncer at the Tavern, different from the original 911 caller, told him that he saw the suspect rack the slide on a chrome handgun and yell "anybody want some?"
>
> 01:57 – Officers Prusa, Steiner, and others performed a felony stop of the Toyota.

(Dkt. No. 30-1 at 3.)

---

[2] The dispatcher provided the officers with the information via a Computer Aided Dispatch Program (CAD). A record of these dispatches is memorialized in what is known as a CAD log, which lists each entry using a time stamp.

Officer Prusa noted that the driver of the Camry, later identified as Defendant Arjay Caraang, appeared to be a Pacific Islander male, in his early 20s, with long black hair in a ponytail, wearing a Seahawks hat and jersey. (Dkt. No. 43-3 at 5–6.) Officer Prusa told the occupants of the Toyota that they were being detained while she investigated a report of unlawful display of a weapon at Cloud Nine. (*Id*. at 6.) The occupants denied having a gun or being involved with the incident at the tavern. (*Id*.) Officer Prusa asked Caraang for his consent to search the car, and told him if he withheld consent she would obtain a search warrant. (*Id*.)

At the same time as Officer Prusa was talking to Caraang, Officer Steiner learned from the officers at Cloud Nine that "they were unable to establish probable cause for a crime as they had not yet located a victim." (*Id*. at 8.) Thinking the occupants of the Toyota would soon be released, Officer Steiner conducted a frisk of the car's interior. (*Id*.) He looked underneath the passenger seat and saw what looked like a silver handgun. (*Id*.)

Officer Hale brought the bouncer from Cloud Nine to where Caraang was detained to perform an identification. (*Id*. at 9.) The bouncer told the Officer that he was "100%" certain Caraang was the customer with the gun. (*Id*.) Officer Prusa ran Caraang's name through her in-car computer and learned that he had four prior felony convictions. (*Id*. at 6.) Officer Prusa arrested Caraang for felon in possession of a firearm. (*Id*.) Officer Prusa later obtained a search warrant and recovered a loaded silver .380 Jimenez Arms pistol from underneath the front passenger seat. (*Id*. at 3, 5.) Caraang was ultimately indicted on one count of felon in possession of a firearm and one count of felon in possession of ammunition. (Dkt. No. 1 at 1–2.)

## II.    DISCUSSION

Caraang asks the Court to suppress evidence of the handgun and ammunition taken from his car because the police lacked reasonable suspicion to detain him, Officer Steiner conducted an unlawful search of the car, and Caraang never consented to a search. (*See generally* Dkt. No. 34.) The Government counters that the police had reasonable suspicion that someone in the car

had committed a crime, Officer Steiner conducted a permissible frisk of the car based on officer safety concerns, and Caraang gave Officer Prusa consent to search the car. (Dkt. No. 34 at 5–6.)

### A. Seizure of Car and *Terry* Stop

Caraang argues that the police lacked reasonable suspicion to stop his vehicle for two reasons. First, Caraang asserts that the police relied on a 911 caller's report of a person in possession of a gun, which does not provide sufficient suspicion to conduct a *Terry* stop. (Dkt. No. 32 at 5–6) (citing *Fla. v. J.L.*, 529 U.S. 266, 268 (2000)). Second, Caraang asserts that if the police had reasonable suspicion, it was only with regard to a completed misdemeanor—unlawful display of a weapon—which does not justify the use of intrusive felony stop procedures. (*Id*. at 8–9) (citing *United States v. Grigg*, 498 F.3d 1070, 1077 (9th Cir. 2007)). Alternatively, Caraang argues that the police's felony stop procedures transformed his detention into an arrest lacking probable cause. (Dkt. No. 45 at 4–5.)

#### 1. Reasonable Suspicion Based on 911 Call.

Consistent with the Fourth Amendment's prohibition against warrantless seizures, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot . . .'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). A police officer may conduct an investigatory traffic stop where she has "reasonable suspicion that a particular person has committed, is committing, or is about to commit a crime." *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citation and internal quotation marks omitted). When reviewing the propriety of a *Terry* stop, courts must consider the totality of the circumstances and determine "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted).

A telephone tip to police can provide the basis for a *Terry* stop, so long as the tip bears "sufficient indicia of reliability to provide reasonable suspicion . . . ." *United States v. Edwards*,

761 F.3d 977, 983 (9th Cir. 2014) (citation omitted). The Supreme Court has emphasized several relevant factors to consider when determining whether a citizen tip is sufficient to provide reasonable suspicion that a crime has occurred. *See Navarette v. California*, ––– U.S. ––––, 134 S.Ct. 1683, 1687–1690 (2014). These factors include: (1) whether the tipster used 911 to report information, (2) whether the tipster was an eye-witness to the reported criminal activity, (3) whether the information was reported contemporaneously with the criminal activity, and (4) whether the report was of an ongoing or dangerous crime. *Id.*; *see also United States v. Terry–Crespo*, 356 F.3d 1170, 1171 (9th Cir. 2004) (outlining similar factors).

Officer Prusa had reasonable suspicion to stop Caraang's car. First, Cloud Nine employee's 911 call possessed sufficient indicia of reliability to support a *Terry* stop. The employee provided his name, location, and telephone number. (Dkt. No. 30-1 at 2–3.) The employee was a first-hand witness to the suspected criminal activity, as he reported seeing the suspect with a gun in his hand and hearing the gun "click," as if it were being loaded. (*Id.* at 2.) The employee contemporaneously described what was going on, updating the dispatcher over the course of several minutes. (*Id.*) Finally, the employee gave a detailed description of the suspect and the car he was associated with. (*Id.* at 2.) As Officer Prusa arrived on scene, she observed the same car leaving the parking lot, which corroborated the caller's report. (Dkt. No. 43-3 at 5.)

Second, the conduct reported by the Cloud Nine employee could have represented criminal activity. Under Washington law, it is a crime "to carry, exhibit, display, or draw any firearm . . . in a manner, under circumstances, and at a time and place that either manifests an intent to intimidate another or that warrants alarm for the safety of other persons." Wash. Rev. Code § 9.41.270. The employee told the 911 dispatcher that the suspect was waving a gun around in the parking lot with a group of 5 to 10 people nearby. (Dkt. No. 30-1 at 2–3.) The employee also reported that the man was possibly arguing with others and that he heard what sounded like a bullet being chambered. (*Id.* at 2.) Under the totality of the circumstances, Officer Prusa could have reasonably believed that this conduct represented, at a minimum, the display of

a firearm that caused "alarm for the safety of other persons." Wash. Rev. Code § 9.41.270.

These facts are distinguishable from cases that Caraang cites to support his position. In *Florida v. J.L.*, the Supreme Court held that police lacked reasonable suspicion to detain a man waiting at a bus stop based solely on an anonymous caller's tip that described the man and reported he was carrying a gun. 529 U.S. at 268. The Court reasoned that the anonymous tip was not sufficiently reliable because it described activity—possession of a gun—that was not necessarily criminal or dangerous. *Id*. at 268–269. By contrast, the 911 caller in this case identified himself and reported that the suspect was waving a gun outside of a bar, with others around. Unlike *J.L.*, the reported activity in this case went well beyond mere possession of a gun, and provided police with a reasonable articulable suspicion to stop Caraang's car.

2. <u>Reasonableness of Felony Stop Procedures.</u>

Caraang next argues that it was unlawful for the police to employ felony stop procedures because, at most, they were investigating a completed misdemeanor. (Dkt. No. 32 at 7–10.) The Ninth Circuit has expressly declined to create a *per se* rule that would make *Terry* stops constitutionally unreasonable when the police are merely investigating a completed misdemeanor. *Grigg*, 498 F.3d at 1081. "Circumstances may arise where the police have reasonable suspicion to believe that a person is wanted in connection with a past misdemeanor that the police may reasonably consider to be a threat to public safety." *Id*. A reviewing court "must consider the nature of the misdemeanor offense in question, with particular attention to the potential for ongoing or repeated danger (e.g., drunken and/or reckless driving), and any risk of escalation (e.g., disorderly conduct, assault, domestic violence)." *Id*. This public safety consideration must be balanced against the privacy interests at stake "along with the possibility that the police may have alternative means to identify the suspect or achieve the investigative purpose of the stop." *Id*.

Under the totality of the circumstances, the Court concludes that the police were justified in conducting a felony stop of Caraang's car because the information provided by the 911 caller

and bouncer raised a sufficient public safety concern, and there was not an alternative means to achieve the investigative purpose of the stop. Minutes before detaining Caraang, the police had received reports from two people that a suspect matching Caraang's description had been waving a gun outside of a bar while surrounded by 5 to 10 other people. (Dkt. No. 30-1 at 2–3.) One of the witnesses additionally reported that Caraang had racked the slide of the gun and yelled "anybody want some?" (*Id*. at 3.)

Officers Prusa and Steiner could have reasonably believed that the conduct they were investigating was more than a misdemeanor. The Officers had information that the suspect was not only brandishing a handgun, but was possibly arguing with others and had yelled a threatening comment. (*Id*.) Caraang argues that the Officers could not have been investigating a felony because Officer Hale reported that he had not found victims and did not have "PC." (Dkt. No. 45 at 7.) However, the question of probable cause has to do with the ability to make an arrest, not with requisite suspicion needed to conduct a *Terry* stop. *See Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause.") Moreover, this information came just a few minutes before Caraang was detained and Officer Hale was still at Cloud Nine talking to witnesses. (Dkt. Nos. 30-1 at 2–3, 43-3 at 9.)

Even if the Court concluded the police were investigating a misdemeanor, the reported conduct presented a sufficient threat to public safety to justify an investigatory detention. If the Officers had not attempted to stop the suspect, there was a reasonable likelihood the dangerous conduct—brandishing a firearm outside a bar—could have escalated or been repeated, if not at Cloud Nine then potentially somewhere else. When police respond to an emergency situation involving a firearm, there is a strong public safety interest to ensure the conduct is not repeated. That concern is particularly acute under the facts of this case where police responded to the display of a firearm as part of what appeared to be an argument outside a bar in the middle of the night. Had the Officers not stopped Caraang's car, there was also a likelihood they would have been unable to obtain his identity or further investigate the reported crime. Other than a physical

description of the customer holding the gun, the witnesses at the bar did not provide any personal information that would have allowed the Officers to identify Caraang. If the Officers had allowed the Toyota to leave the scene, they could not have ensured that the incident would not escalate or be repeated later on that night.

Under the totality of the circumstances, the Court concludes that the Officer's use of a felony stop was reasonable.

### 3. *Terry* Stop Versus Arrest.

For the first time in his reply brief, Caraang argues that the police's use of felony stop procedures turned his detention into an arrest, for which there was not probable cause. (Dkt. No. 45 at 4–5.) "The totality of the circumstances determines whether and when an investigatory stop becomes an arrest." *Edwards*, 761 F.3d at 981 (citation omitted). Under this analysis, Courts must weigh "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted . . . and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citations omitted). "The second inquiry frequently proves determinative." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009).

It is undisputed that the police officers in this case used intrusive felony stop procedures to detain Caraang and the other passengers in his car. The officers removed the three occupants from the Toyota, frisked them, and put them in handcuffs in the back of their patrol cars. (Dkt. No. 43-3 at 8.) The tactics used to detain Caraang restricted his ability to leave the scene and went beyond the intrusion normally associated with a *Terry* stop. *See United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.").

On the other hand, the police officers had a reasonable belief that the car's occupants, and specifically Caraang, could be armed and dangerous. Before executing the felony stop, the

Officers had received reports from two Cloud Nine employees that a suspect associated with the Toyota had just minutes earlier waved a pistol in the air, chambered a round, and yelled "anybody want some?" while surrounded by a group of people. (Dkt. No. 30-1 at 3.) In addition, Caraang matched the description of the suspect provided by the witnesses. (Dkt. No. 43-3 at 8.) The police officers therefore had reasonable safety concerns that justified their use of felony stop procedures. The Court's conclusion is supported by other cases from the Ninth Circuit that have "permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001); *see also Edwards*, 761 F.3d at 982. Under the totality of the circumstances, the Court concludes that the police officers' use of felony stop procedures did not turn an otherwise permissible *Terry* stop into an arrest.

### B. Officer Steiner's Search of the Car

Caraang asserts that even if the Court finds that police had reasonable suspicion to stop his car, Officer Steiner committed an unconstitutional search when he looked under the passenger seat and discovered the handgun. (Dkt. No. 32 at 11.) Caraang cites to a Supreme Court case that prohibits police from searching a suspect's car incident to arrest when the suspect is restrained and unable to access the car. (*Id.*) (citing *Arizona v. Gant*, 556 U.S. 332, 351 (2009)). In *Gant*, the Supreme Court limited its holding to searches conducted incident to arrest and specifically distinguished situations in which law enforcement may search a vehicle during a *Terry* stop if officer safety is implicated. *Gant*, 556 U.S. at 346 (noting an exception to its holding that "permits an officer to search a vehicle's passenger compartment when he has reasonable suspicion that an individual, whether or not the arrestee, is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.'").

Given the facts of this case, Caraang's reliance on *Gant* is misplaced. As the Court has already ruled, the use of felony stop procedures did not convert Caraang's detention into an arrest. Therefore, Officer Steiner did not conduct a search incident to arrest when he looked

underneath the passenger seat of the car and the holding in *Gant* does not apply to this situation.

The Court concludes that Officer Steiner's conduct was permissible under the Supreme Court's decision in *Michigan v. Long*. 463 U.S. 1032 (1983). In *Long*, the Supreme Court held that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id*. at 1049.

In this case, Officer Steiner had a reasonable belief that Caraang was dangerous and might gain immediate control of a firearm from inside the car. Officer Steiner knew that two people had reported that a man matching Caraang's exact description had just minutes earlier waved a handgun outside of a bar, racked the slide of the gun, and yelled "anybody want some?" while surrounded by a group of 5 to 10 others. Caraang was also reported to have possibly been drinking and arguing with people outside the bar. Those facts provided Officer Steiner with a reasonable and articulable basis to believe Caraang could be dangerous.

Moreover, Officer Steiner had a reasonable belief that Caraang might gain immediate control of a firearm. Although Caraang was detained at the time of the search, Officer Steiner had reason to believe Caraang would soon be released based on Officer Hale's statement that he had not identified victims at Cloud Nine and there was no probable cause. (Dkt. Nos. 30-1 at 3, 43-3 at 8.) Officer Steiner stated in his report that "the decision was made to release the detained subjects from the vehicle." (Dkt. No. 43-3 at 8.) Officer Steiner also knew that the handgun had not been recovered and that Caraang, along with the other occupants denied any knowledge of the gun. (*Id*. at 6.) Officer Steiner conducted a minimally intrusive search by looking underneath the passenger seat—a location in the car where a firearm could be located. Under the totality of the circumstances, the Court concludes that Officer Steiner conducted a lawful frisk of the car that did not violate the Fourth Amendment.

Having concluded that Officer Steiner's frisk of the car was lawful, the Court need not consider Caraang's argument that he did not provide consent for the search. (Dkt. No. 32 at 12.) Based on Officer Steiner's discovery of the gun, the Cloud Nine employee's identification of Caraang as the person with the gun, and the fact that Caraang was a convicted felon, there was probable cause to arrest Caraang on suspicion of felon in possession of a firearm. Accordingly, Caraang's motion to suppress evidence of the handgun and ammunition is DENIED.

### C. Motion to Seal

The Government requests that the Court order its response to Caraang's motion to suppress (Dkt. No. 42) as well as an exhibit to its response (Dkt. No. 42-1) be maintained under seal. (Dkt. No. 41). The Government asserts that both its response and the exhibit—which is a copy of a forensic psychological evaluation Caraang previously underwent—contain confidential information regarding Caraang's mental health condition that should not be disclosed to the public. (Dkt. No. 41 at 1.) The Court previously granted Caraang's motion to maintain the same forensic evaluation under seal. (Dkt. No. 36.) Therefore, the Court GRANTS the Government's motion to seal (Dkt. No. 41) as it relates to the forensic evaluation (Dkt. No. 42-1). Conversely, the Court concludes that it is unnecessary to maintain the Government's response (Dkt. No. 42) under seal. The Clerk is DIRECTED to maintain Docket Number 42-1 under seal during the pendency of this case. The Clerk is further DIRECTED to unseal Docket Number 42.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress (Dkt. No. 32) is DENIED and the Government's motion to seal (Dkt. No. 41) is GRANTED in part and DENIED in part.

DATED this 15th day of May 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE